**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| United States of America, | No. CR-20-00051-002-TUC-JAS (DTF) |
|---|---|
| Plaintiff, | **REPORT AND RECOMMENDATION** |
| v. | |
| Demetrius Verardi Ramos, | |
| Defendant. | |

Before the Court are Defendant Demetrius Ramos's motions to suppress statements (Doc. 88), to suppress evidence following unlawful seizure and arrest (Doc. 89), and to dismiss the indictment (Doc. 94).[1] Defendant seeks to suppress statements and evidence recovered following the stop, such as two cell phones, and dismissal of the case. (Doc. 88 at 1, Doc. 94 at 1, Doc. 194 at 28.) This case has been assigned to the undersigned for report and recommendation pursuant to LRCrim 5.1. (Doc. 10.) The motions came before the Court for an evidentiary hearing on September 1, 2020, and October 8, 2020. (Docs. 163, 173.) Magistrate Judge Ferraro recommends that the District Court, after its independent review, deny Defendant's motions.

## FACTUAL BACKGROUND

### Surveillance

On December 3, 2019, in Douglas, Arizona, agents from the Border Patrol Disrupt

---

[1]Defendant requests the Court take judicial notice of the deposition and grand jury testimony. (Doc. 127.) The Court has reviewed the items in the record, including the requested transcripts.

and Deny Unit conducted surveillance on a "stash house" within three miles of the international border,[2] where there had been recent smuggling activity. (Doc. 164 at 47-48, 190, 232; Doc. 177 at 15.) Agent Daniel Regan testified that, approximately a month before the incident, he had "seen illegal aliens coming out of that resident." (Doc. 177 at 12, 15.) Agent Brad Albertson attested he had known that an "alien smuggling coordinator" lived at the stash house based on a previous case. (Doc. 164 at 44, 48.) While conducting surveillance, Agent Albertson saw the known alien smuggling coordinator come in and out of the house, and "look up and down the street as if he was waiting for somebody." *Id.* at 70. Agent Albertson testified that, around 8:00 p.m., he had "noticed a 2017 Lexus ES 350 driving really slowly down 11th Street," seeming as though "the driver of the vehicle wasn't too familiar with the area." *Id.* at 49-50. Later, the agents identified Defendant as the driver. *Id.* at 242. Defendant made a U-turn and drove slowly down the street; he then made a second U-turn, and "slowly roll[ed] back down." *Id.* at 50-51. The car "turned into the driveway where the carport area is and just parked right in front of the house, turned off the headlights and waited for a second." *Id.* 51. Four people ran from the carport—crouching as they did so—and tried to get into the car. *Id.* at 53. Defendant let three individuals in the car but turned the fourth away. (Doc. 177 at 59; Exh. 12 at 15:17-20, 36:8-9.) Agents believed all four individuals were in the car. (Doc. 164 at 80.)

Agents testified they had followed Defendant as he drove and noted Defendant's driving had been "evasive," as though he believed someone was following him. *Id.* at 57, 75, 232. He returned to the stash house and told the passengers to get out. (Doc. 177 at 63.) Two agents testified that they had seen only two individuals go back toward the house. (Doc. 164 at 59, 194.) As Defendant drove away from the residence, agents followed him. *Id.* at 194.

Agent Walter Brown testified that he had seen Defendant drive into and immediately out of a parking lot and then turn into the next driveway, a gas station. *Id.* at

---

[2]Agents testified that they stopped Defendant within three or four miles of the international border. (Doc. 177 at 223, 263.) Exhibits show that the stash house is between where agents stopped Defendant and the international border. (Exh. 4.)

189, 195. For four to five minutes, the agents lost visual contact with Defendant, but they knew that he had left the gas station quickly after pulling in. *Id.* at 196, 224. Agents testified that they next saw Defendant at a second gas station, but he quickly left before they could contact him. *Id.* at 237-38.

**Stop/Knock-and-Talk/Arrest**

Agents followed Defendant as he left Douglas. *Id.* at 198-99. At approximately 8:30 p.m., Agents Walter Brown and Jesus Barron stopped Defendant. *Id.* at 189, 199, 213, 230. Agent Barron spoke with Defendant as Defendant sat in his car. *Id.* at 216. The agents testified that they had not seen anyone other than Defendant in the car. *Id.* at 200, 239. Agent Barron asked if he could inspect the trunk, to which Defendant agreed. *Id.* at 200, 263. No one was in the trunk. *Id.* Agent Barron testified that Defendant had appeared "very nervous"—"avoid[ing] eye contact," "rub[bing] his head" and hands, and "start[ing] to stutter." *Id.* at 240. He asked Defendant to identify himself, asked him about his citizenship, and asked for Defendant's driver's license. *Id.* Defendant provide his name, identified himself as a United States citizen, but refused to give his date of birth or a driver's license. *Id.* Agent Barron contacted Cochise County Sheriff's Office to send a deputy because Defendant had been driving without a license. *Id.* at 121, 201. When the deputy arrived, he also asked Defendant for his date of birth and identification. *Id.* at 121-22. Defendant still refused to provide his date of birth or produce a driver's license. *Id.* at 243-44. Defendant never provided this information, even after multiple requests by two agents and a deputy. *Id.* at 105-06, 243-44.

At about 8:45, agents at the stash house decide to conduct a "knock-and-talk." *Id.* at 62, 88. As agents approached the house, four undocumented immigrants and one United States citizen fled out of the back door and attempted to climb over the back fence. (Doc. 177 at 23-24.) But agents apprehended them. *Id.* Agent Albertson testified that there had been "food trash, trash that's associated with illegal alien smuggling" at the side of the house, and that in the house there had been a "bunch of like camouflage clothing" and more trash. (Doc. 164 at 64, 66.) According to Agent Albertson, he identified two of the

undocumented immigrants as the individuals he had seen running from Defendant's car about thirty to forty-five minutes after he had entered the house. *Id.* at 93.

At approximately 9:00, agents permitted Defendant to call his lawyer. (Doc. 164 at 201; Doc. 177 at 76-77.) Defendant attempted to call his attorney twice, but he was unable to reach him. (Doc. 177 at 74-75.) Defendant then he called a friend in law enforcement. (Doc. 177 at 76, 101; Exh. 62 at A3.) The agents were able to hear these calls because Defendant was using a speaker. (Doc. 164 at 106, 201, 244.) While Defendant was on his law-enforcement friend call, the agents received information that the two individuals who had run from Defendant's car were undocumented. *Id.* at 124. Agents testified that, after receiving this new information, they had informed Defendant he was under arrest and read him his *Miranda* rights. *Id.* at 203, 213, 245. Agent Brown testified this had occurred at 9:35, but a careful review of the record indicates that the call ended around 9:20.[3] (*Id.*; Exh. 62 at A3.) Immediately after this call Defendant was advised he was under arrest. (Doc. 164 at 108.) Then Defendant requested to call his wife, which agents permitted; he spoke with her at approximately 9:25. (Doc. 177 at 76; Exh. 62 at A3.)

**At the Station**

Agents transported Defendant to the Douglas Border Patrol Station and placed him in a cell. (Doc. 177 at 78.) At some point, Defendant asked for some prescription medication from his car. *Id.* at 27-28. When agents took Defendant's fingerprints, an agent checked if Defendant was okay because he had needed the medication. *Id.* at 27. An agent helped him get the medication. *Id.* The timing of the conversation and fingerprinting is unclear.[4]

Agent Robert Marrufo[5] discovered that Defendant was not a United States citizen and that his visa had expired. (Doc. 164 at 99, 109.) At approximately 3:40 a.m., Agent Marrufo went into Defendant's cell to conduct a welfare check and to inform him that the

---

[3] The Court does not find this difference to be significant but notes it.

[4] The Court believes there is some ambiguity that neither party clarified as to when this conversation took place. It is possible this was one conversation occurring as agents took Defendant's fingerprints or this was two conversations where the latter occurred as agents took Defendant's fingerprints. (Doc. 177 at 27-28.)

[5] Since this incident, Agent Marrufo has retired. (Doc. 164 at 99.)

agents knew he was unlawfully in the United States. *Id.* at 110, 112. About forty minutes later, Agent Marrufo again entered Defendant's cell and showed him a plastic bag. (*Id.* at 112-13; Exh. 70 at 2:34-2:35.) At the evidentiary hearing, Defendant claimed that an agent had come into his cell, had shown him a plastic bag with laboratory results indicating narcotics had been found in his car, and had told him that if he talked to the agents they would not "use" the narcotics against him. (Doc. 177 at 85-86.) After prompting from his attorney, Defendant identified this agent as Agent Barron. *Id.* at 82, 85. The Assistant United States Attorney (AUSA) asserts that the agent on the video was Agent Marrufo, and Agent Marrufo testified about going into the room. (Doc. 164 at 111; Doc. 174 at 197.) This Court finds that it is more credible that the agent was Agent Marrufo. Agent Marrufo did not recall having a plastic bag or what was in it, but he denied every aspect of Defendant's claim. (Doc. 164 at 115, 127-28.)

Agent Marrufo took Defendant into an interrogation room, and Agent Barron read Defendant his *Miranda* rights, once more. (Doc. 164 at 114; Exh. 9 at 3-4.) Defendant explicitly agreed to speak to them without a lawyer. (Exh. 9 at 3-4.) Defendant expressed multiple times that he understood his right to a lawyer. He told the agents, "I know I can, you know, get the lawyer and then, you know, play this stupid game, you know, but I'm— I'm on the receiving end here. You know, I'm overstay with my visa, and I don't want to get deported." *Id.* at 11:5-8. He asked, "Should I get a lawyer right now (indiscernible) like a sense of—like if you—what can be done for me?" *Id.* at 41:1-3. Throughout the interrogation, Defendant tried to see how the agents would "help" him; he offered to "get [them] more information" and wear a "bug." *Id.* at 31:13-21, 35:9-22, 44:24-25, 47:3-8, 49:5-7, 50, 54-55. He also said, "I gave up. You know, I can have a lawyer." *Id.* at 44:6-7. In the final mention of a lawyer, Defendant said,

> Look, man. If you want to catch me for [transporting illegal aliens], I'm going to be just like a sheep, man, all like those guys that—just one more guy doing that. If you guys just want to do that, man, like, yeah, I can call the lawyer, you know, and situate that shit[.]

*Id.* at 48:8-9. However, Defendant never invoked his right to an attorney during the

interrogation.

Defendant admitted to transporting undocumented immigrants for profit approximately twenty times. *Id.* at 17-18. He also described how he had agreed to transport people from Douglas to Phoenix for a thousand dollars per person on December 3 and how he had worn scrubs so he would not raise suspicions; however, he denied knowing that the three passengers he picked up were undocumented. *Id.* at 13, 16, 36, 40, 42, 47. He said he had "pushed" the fourth person out of the car because he "didn't really like him" and had a "gut feeling." *Id.* at 14. During the interrogation, Defendant admitted he was not forced to talk; however, he thought he would get something in return because the agents had "kind of" made promises to him. *Id.* at 52:22-53:10. At the evidentiary hearing, Defendant testified he had been desperate and had "exaggerat[ed]" his involvement so he could go home. (Doc. 177 at 117-18.) The agents were adamant, during the interrogation and at the evidentiary hearing, that they did not make any promises to Defendant or threaten him in anyway. (Doc. 164 at 118-19, 135, 137-38, 250-51, 265-66; Exh. 9 at 45:12-23, 49:8-11, 53:11-12.)

**Defendant's Testimony from Evidentiary Hearing**

At evidentiary hearing, Defendant testified to his version of the events. He first described his background. (Doc. 177 at 53-55.) Originally, he lived in Brazil and decided to come to the United States to finish school. *Id.* at 53. He graduated with degrees in physiology and nuclear medicine technology. *Id.* In 2017, his H1B visa for high qualified degree holders expired. *Id.* at 54. Afterward, he had difficulty obtaining employment. *Id.* at 55.

Turning to the events that led to his arrest, Defendant testified that Gabriel, a friend of his, had offered him a thousand dollars to "pick up passengers to do Christmas shopping in Phoenix." *Id.* at 56-57. Gabriel told him that Uber would not pick-up passengers so close to the border. *Id.* at 56. The Defendant testified that he had agreed to pick up the passengers from Douglas and take them to Tucson, so they could go Christmas shopping the next morning. *Id.* at 56. Then, he would return them to Douglas. *Id.*

Gabriel provided Defendant with a cellphone and an address. *Id.* at 57. Defendant drove to the house and spoke with someone about the shoppers. *Id.* at 58. Four people came to his car, but he refused to transport all four because "the groceries that they ha[d] to buy" would not fit in his car. *Id.* at 59. So, he left the house with three passengers. *Id.* He became suspicious that the passengers were not in the country legally because they were speaking Spanish and would not respond to him in English. *Id.* at 60-61. Defendant then decided to drop the passengers back at the house. *Id.* at 62. He was able to find the house in the dark while talking to Gabriel and using his phone to find the address. *Id.*

After dropping off his passengers, Defendant said he had driven to a gas station so he could "get [his] bearings." *Id.* at 64. However, the first gas station was very dark, and he did not have a "good signal." *Id.* He went to a second gas station because he was afraid Gabriel and his "ilk" would be mad at him and could be following him. *Id.* at 64-65. Then, he left Douglas. *Id.* at 65.

Defendant testified that, when the agents stopped him, they had only asked him for his name. *Id.* at 67, 77. He later admitted that the agents had asked for his date of birth. *Id.* at 120. Defendant gave them his name and his permission to search his trunk. *Id.* at 67. He did not tell them that he was a United States citizen or that his visa had expired. *Id.* at 77. He testified that he had asked if he was free to go home "[e]very minute," "every interaction," after "[e]very question that they asked." *Id.* at 68. Around 9:00 p.m., the agents let him call his attorney, but they required that he do so on speaker. *Id.* at 75, 76. He was unable to reach his attorney after two attempts, so he called a friend in law enforcement. *Id.* at 74-76. Before agents took him out of the car, he asked to call his wife, and they acquiesced. *Id.* at 76. Agents told him he was under arrest and took him to the Border Patrol Station. *Id.* at 78.

According to Defendant, the agents put him into a cell, where he was stressed and crying. *Id.* at 78-79. Defendant testified that an agent had come into his cell and told him "things would be much worse" if he did not talk to them. *Id.* at 82-83. The agent promised Defendant he could go home if he cooperated. *Id.* at 83. Defendant testified the agent

returned and showed him "a plastic bag with the laboratory result of a drugs that was test positive they said it was found in [Defendant's] car." *Id.* at 85. Defendant claimed the agent threatened to "use" the test results against him unless he talked. *Id.* at 86. So, he agreed to talk. *Id.* at 89. During the interrogation, he did not mention the plastic bag because then he "would incriminate [him]self." *Id.* at 111. He also characterized his questions about "what can be done" as his attempt to "talk to the[ agents] about the conversation" he had with them in his cell. *Id.* at 114-15. He also testified that he had been desperate, so he had exaggerated his participation and knowledge to convince the agents he had helpful information. *Id.*at 117-18.

Defendant testified that, after the interrogation, agents had taken his fingerprints. *Id.* at 84-85. He said this had been when agents discovered his visa had expired and when they offered him food for the first time. *Id.* at 78, 86.

**Procedural History**

On December 20, 2019, the Government offered Defendant a pre-indictment plea, which Defendant rejected. (Doc. 94-1.) On January 2, 2020, the grand jury returned a three-count indictment, charging Defendant with the following: Count One knowingly and intentionally conspiring to transport two undocumented immigrants and Counts Two and Three transporting the two undocumented immigrants named in Count One. (Doc. 35.) On January 28, 2020, the parties participated in video depositions of the three of the four undocumented immigrants detained as material witnesses. (Doc. 49.) Fernando Lucrecio-Morales was released without completing a deposition because there was not an interpreter available in his native language, Nahuatl. (Doc. 126 at 6.) Lucrecio-Morales appears to have been the individual Defendant refused to transport. (Doc. 125-2 at 1.) The AUSA said that it "would just not be calling him as a witness, [and at trial the deposition was] not necessary to move forward with the government's case." (Doc. 126 at 4:13-14.)

After the video depositions, on March 11, 2020, the Government presented the case to the grand jury again. (Exh. 11.) The grand jury returned a nine-count superseding indictment charging Defendant as follows: Count One knowingly and intentionally

conspiring to transport all four undocumented immigrants, Counts Two through Five harboring or transporting the four immigrants, and Counts Six through Nine transporting the four immigrants. (Doc. 70.) Defendant then filed his motions and the Court conducted an evidentiary hearing. (Docs. 88, 89, 94, 163, 173.)

This Court took the matter under advisement. (Doc. 173.)

## DISCUSSION

Defendant asserts that agents detained him for an unreasonable amount of time and arrested him absent probable cause. (Doc. 89 at 5.) He requests suppression of any evidence following these illegal seizures. *Id.* at 6.

### Stop

In *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968), the Supreme Court of the United States recognized that an officer's reasonable suspicion that criminal activity is afoot permits a brief stop to investigate further. Reasonable suspicion is a lesser standard than that of probable cause. *United States v. Valdez-Vega*, 738 F.3d 1074, 1078-80 (9th Cir. 2013). It exists when an officer can "point to specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion." *Terry*, 392 U.S. at 21.

> In the context of border patrol stops, the totality of the circumstances may include characteristics of the area, proximity to the border, usual patterns of traffic and time of day, previous alien or drug smuggling in the area, behavior of the driver, appearance or behavior of passengers, and the model and appearance of the vehicle. Not all of these factors must be present or highly probative in every case to justify reasonable suspicion. And the facts must be filtered through the lens of the agents' training and experience.

*Valdez-Vega*, 738 F.3d at 1079 (citations omitted).

A *Terry* stop must end when either the "mission" of the stop is addressed or reasonably should have been. *See Rodriguez v. United States*, 575 U.S. 348, 354 (2015). This provides time to conduct the "ordinary inquiries incident" to a stop. *Id.* at 355 (quoting *Illinois v. Caballes*, 543 U.S. 405, 408 (2005)). "In assessing whether a detention is too long in duration to be justified as an investigative stop, [courts] consider it appropriate to

1   examine whether the police diligently pursued a means of investigation that was likely to

2   confirm or dispel their suspicions quickly . . . ." *United States v. Sharpe*, 470 U.S. 675, 686

3   (1985). Officers may extend a stop if the individual's answers do not dispel their suspicions

4   and actually created new ones. *United States v. Rodgers*, 656 F.3d 1023, 1027 (9th Cir.

5   2011) (quoting *United States v. Torres-Sanchez*, 83 F.3d 1123, 1128 (9th Cir. 1996)).

6       Here, defense counsel conceded at the evidentiary hearing "that the[ agents] had

7   founded suspicion to make the stop." (Doc. 177 at 186.) Instead, he argues that once agents

8   saw he was alone in the car, the stop should have ended. (Doc. 89 at 5.) This fails for two

9   reasons. First, the stop was extended because Defendant refused to provide identifying

10   information to the agents and an officer. (Doc. 164 at 105-06, 240, 243-44) Defendant's

11   attempts to argue that he was under no obligation to provide his date of birth and that this

12   was a roving immigration stop are unavailing. (Doc. 177 at 139, 189.) Defendant was

13   required to carry his identification, *see* 8 U.S.C. § 1304(e), and his driver's license, *see*

14   A.R.S. § 28-3169(A). The date of birth permits law enforcement agents to check

15   immigration and warrant status. Therefore, they were unable to perform "ordinary inquiries

16   incident" to a lawful immigration stop, such as check immigration or warrant status. *See*

17   *Rodriguez*, 575 U.S. at 355 (quoting *Caballes*, 543 U.S. at 408). Defendant conceded that

18   agents had reasonable suspicion for the initial stop. (Doc. 177 at 186.) In conjunction with

19   his nervous demeanor, his previous actions provided reasonable suspicion for agents to

20   continue detaining Defendant.

21       Second, the agents' reasonable suspicion that Defendant had transported

22   undocumented immigrants did not dissipate simply because they failed to catch him

23   red-handed or because agents had been mistaken about the number of individuals to enter

24   or exit the vehicle. In fact, Agent Barron testified that based on his training and five years

25   of experience Defendant's demeanor had indicated "something's going on." (Doc. 164 at

26   230, 240.) The agents took a reasonable amount of time to conduct the knock-and-talk,

27   which would quickly dispel or confirm their suspicions that Defendant had picked up

28   undocumented immigrants and had dropped at least two back at the stash house. *Id.* at 62,

271-72. Thus, the agents only held Defendant for the time necessary to dispel their suspicions. Moreover, Defendant's demeanor and failure to answer their questions actually created new suspicions. The stop was not impermissibly extended and was lawful.

This Court recommends denying Defendant's motion to suppress evidence based on an illegal extension of a *Terry* stop.

### Arrest

A warrantless arrest is constitutional if officers have probable cause to believe the individual committed a felony and the arrest occurs in a public place. *Maryland v. Pringle*, 540 U.S. 366, 370 (2003). Probable cause has not been reduced to a precise or finely tuned standard; instead, it is fluid and relies on the totality of the circumstances. *Cf. Florida v. Harris*, 568 U.S. 237, 243-44 (2013) (considering warrantless search). It "exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested" or when "a prudent person would have concluded that there was a fair probability that [the defendant] had committed a crime." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (alteration in *Lopez*) (quoting *United States v. Smith*, 790 F.2d 789, 792 (9th Cir. 1986)). "While conclusive evidence of guilt is of course not necessary under this standard to establish probable cause, '[m]ere suspicion, common rumor, or even strong reason to suspect are not enough.'" *Id.* (alteration in *Lopez*) (quoting *McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th Cir. 1984)).

Here, at the time of arrest, agents knew the following: a stash house close to the border with recent smuggling activity had items consistent with a smuggling operation, such as camouflage clothing and trash. (Doc. 164 at 64, 66, 232.) A known smuggling coordinator walked out of the house and looked around the street as if he were waiting for someone. *Id.* at 70. Thereafter, Defendant drove up to the house; four individuals ducked down and ran to his car, at least two quickly jumped inside. *Id.* at 50, 59. An agent later identified two of these individuals as two of the four undocumented immigrants found at the stash house. *Id.* at 66. The car was registered to a Tucson address, which is common in

smuggling operations. *Id.* at 70, 267. Defendant drove evasively, as though he thought someone were following him. *Id.* at 57. The agents believed Defendant had identified their surveillance, and consistent with their belief, Defendant returned to the stash house and dropped off his passengers. *Id.* at 59. Defendant then left the stash house and drove to two separate gas stations without purchasing gas. *Id.* at 174, 195, 196, 237. After Defendant was stopped, he appeared very nervous, and refused to completely identify himself. *Id.* at 240. Give these known facts, there was a fair probability that Defendant had transported undocumented immigrants and conspired with others to do so. Therefore, the agents had probable cause to arrest Defendant.

This Court recommends denying Defendant's motion to suppress because of an illegal arrest. The arrest was supported by probable cause.

### Statements

Defendant moves to suppress all his statements taken contrary to his Fifth and Sixth Amendment rights to counsel. (Doc. 88.) He argues that agents violated his rights by initiating a custodial interrogation after he had requested to speak with a lawyer. *Id.* at 5. He also asserts that the agents acted coercively and deceptively, such that his statements were involuntary and must be suppressed for all purposes. *Id.* at 6.

The Government contends that when Defendant asked to call an attorney he was not in custody and that he waived his *Miranda* rights once under arrest. (Doc. 96 at 5-6.) The Government also denies that the agents threatened or coerced Defendant. *Id.* at 7.

### Fifth Amendment

The Fifth Amendment prohibits a person from being "compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Because the "circumstances surrounding in-custody interrogation can operate very quickly to overbear" an individual's will, the Supreme Court has held that an individual "must be clearly informed that he has the right to consult with a lawyer" prior to a custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 469, 471 (1966). "Custody" requires a fact intensive question of whether, when considered objectively, a "reasonable person [would] have felt he or she was not at

liberty to terminate the interrogation and leave." *Howes v. Fields*, 565 U.S. 499, 509 (2012) (alteration in *Howes*) (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). These rights may be waived, but the waiver must be voluntary, knowing, and intelligent. *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

Here, during the stop, Defendant asked to speak with his lawyer, and the agents allowed him to make several calls. (Doc. 164 at 201, 244; Doc. 177 at 76-77.) Defendant attempted to call his attorney twice, but he did not reach him. (Doc. 177 at 76, 101; Exh. 62 at A3.) Thereafter, the agents learned that two of Defendant's passengers had been undocumented immigrants, and they arrested him. (Doc. 164 at 203, 245.) Agents then transported Defendant to a Border Patrol Station. *Id.* at 246. Sometime later, they initiated a custodial interrogation. (Exh. 9.) Before questioning Defendant, Agent Barron read the *Miranda* rights to Defendant. *Id.* at 3-4. And Defendant agreed to talk with agents without an attorney present. *Id.* at 4.

First, Defendant was not in custody when he asked for an attorney. This was a road-side *Terry* stop based on founded suspicion that had not yet risen to the level of probable cause to arrest. *See United States v. Galindo-Gallegos*, 244 F.3d 728, 732 (9th Cir. 2001) (considering a rural stop persons close to international border). *Terry* stops usually do not constitute custody. *See United States v. Bautista*, 684 F.2d 1286, 1291 (9th Cir. 1982). As discussed above, the stop was not longer than was reasonably necessary. Thus, Defendant was not in custody for the purpose of *Miranda* until agents told Defendant he was under arrest, well after he had asked for and attempted to contact his attorney. Defendant requested an attorney prior to being in custody.

Second, the Supreme Court has "never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than 'custodial interrogation.'" *See Bobby v. Dixon*, 565 U.S. 23, 28 (2011) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 182 n.3 (1991)). Further, the Court of Appeals for the Ninth Circuit has stated that based on *McNeil* and *Bobby* a request for a lawyer outside a custodial interrogation does not warrant protections

under *Miranda* or *Edwards*.[6] *See Robertson v. Pichon*, 849 F.3d 1173, 1185 (9th Cir. 2017) (concluding that "if a defendant is not in the context of custodial interrogation . . . the safeguards of *Miranda* and *Edwards* are inapplicable" and "even if the defendant had previously invoked *Miranda* and *Edwards* before being placed in a custodial interrogation context" there would not be protection under *Edwards*). Thus, Defendant's out-of-custody request for an attorney did not trigger protection under *Miranda* or *Edwards*. Therefore, agents were permitted to initiate a custodial interrogation, and if Defendant waived his *Miranda* rights, as was done here, the statement would not violate Defendant's rights. (Exh. 9 at 3-4.) Hence, the agents' actions did not run afoul of *Miranda* or Defendant's Fifth Amendment rights.

Thus, this Court recommends denying Defendant's motion to suppress statements. Agents did not violate *Miranda* when taking the statements.

### *Voluntariness*

Defendant claims that agents threatened him with "a bag of alleged narcotics" and coerced him into making an involuntary statement. (Doc. 88 at 6.) He also asserts that agents made improper promises that if he cooperated, he would be able to go home. (Doc. 104 at 4; Doc. 177 at 183.) The Government disputes the facts of Defendant's claim. (Doc. 96 at 6-7.)

Voluntary confessions are "the product of a rational intellect and a free will." *Blackburn v. Alabama*, 361 U.S. 199, 208 (1960). A statement is involuntary if law enforcement officers used physical intimidation or psychological pressure to coerce a suspect. *See Colorado v. Connelly*, 479 U.S. 157, 167 (1986); *United States v. Tingle*, 658 F.2d 1332, 1335 (9th Cir. 1981). Courts must consider if a defendant's "will was overborne by the circumstances" around the confession, including characteristics of defendant and those of the interrogation. *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (internal quotation marks omitted).

Defendant's account of the incident is central to this issue. The Court does not find

---

[6]*Edwards v. Arizona*, 451 U.S. 477 (1981).

Defendant's allegations that Agent Marrufo threatened him to be credible. In general, Defendant's testimony was incredible. Defendant contradicted himself throughout his testimony and told an untenable story. He initially stated he had been taking the passengers to Phoenix, then changed the location, saying the passengers were going to Tucson to go Christmas shopping. (Doc. 177 at 56.) According to Defendant, he had been contracted to take the passengers to Tucson to stay the night, so they could shop for Christmas the next day, then he would return them to Douglas, for which he was to be paid a thousand dollars. *Id.* He refused to drive the fourth passenger, even though his agreement was apparently for a flat rate—not per passenger as stated during the interrogation—because the passengers would not have room for their "groceries." (*Id.* at 56-57, 59; Exh. 9 at 13.) It is unclear why the "Christmas presents" or "groceries" would not fit into the car's trunk, why the passengers would not just go to Tucson the next day—eliminating the expense of a hotel—or why they would not have just taken a shuttle from Douglas to Tucson for considerable less money. Additionally, although no longer employed in the medical profession, Defendant wore his scrubs and did not bring his driver's license. This is inexplicable given Defendant was acting as a paid chauffeur. (Doc. 164 at 121, Exh. 9 at 36.) He also testified that agents had only asked for his information—not his date of birth—later admitting that two agents and a deputy had asked for his date of birth. (Doc. 177 at 77:7-10, 119-20.) His testimony was not plausible. Also, his demeanor was not that of an honest but nervous witness, but instead was that of a fabricator. Finally, his claims that the agents had made explicit promises to release him and to not charge him the narcotics if he talked are inconsistent with his numerous requests to know what the agents could do for him and his overall demeanor during the interrogation. (Exh. 9 at 31, 33, 35, 44-45, 47, 49, 54.) This Court finds Defendant's testimony was not credible. Accordingly, this Court finds that the agents did not threaten Defendant with a baggie or explicitly promise him he would go home if he cooperated.[7]

---

[7]The Government does not explain the bag, but there are alternative explanations. The most likely of which is that the bag contained medicine Defendant had requested. The timing of this request is not clear in the record, it either happened before or during fingerprinting. Also, the record does not help determine when Defendant was fingerprinted. Defendant

1    Instead, this Court finds the agents' testimony to be credible. Here, Agent Marrufo

2    testified that had advised Defendant to tell the truth, that telling the truth could only help

3    him and that it would "behoove[]" him to do so. (Doc. 164 at 112-13.) He added, "There's

4    an old saying the truth will set you free . . . ." (Exh. 9 at 46.) And he questioned Defendant's

5    information, stating "If you think you're unique and have all this information that's going

6    to liberate you . . . ." *Id.* at 51. Defendant apparently took these as promises that he would

7    be released if he provided information. (Doc. 177 at 122, 125-26.) Agent Barron told him

8    that the agents could not "do anything or nothing can happen unless [he] provide[d] [them]

9    with something," stressing that honesty was key. (Exh. 9 at 11-12.) Agent Marrufo

10   explained

> So we can't promise you anything. The only thing we can do and our job is—
> right here is to take down the information. Now, whether it's truthful or
> you're withholding stuff and not being completely truthful, that's what
> somebody else will read this report, higher up, and they will—they can
> determine whether or not your—your information is credible, where they can
> maybe do something for you or not. Our job here is to get the information
> and the facts.

16   (Exh. 9 at 45.) Agent Marrufo told Defendant he would see a judge "regardless." *Id.* at 49.

17   When Agent Barron told him someone else would evaluate his information, Defendant

18   asked to speak with someone else. *Id.* at 52. Near the end of the interrogation, the agents

19   asked Defendant if he spoke voluntarily; he said he "thought that [he] was going to get . . .

20   something in return" and the agents had "kind of" promised him things. *Id.* at 53. He then

21   offered to wear a "bug" as the agents were ending the interrogation. *Id.* at 54, 55.

22   Considering the potential implied promises that the truth would help Defendant and

23   that the agents would take the information to their "higher up," this Court recommends

24   finding that the statements were voluntary. Defendant is over forty years old, well

---

26   attempted to argue he was not fingerprinted until 5:00 or 6:00 a.m., but defense counsel
     did not properly refresh the agent's recollection with the agent answering, "Possibly.
27   Again, I'm not sure." (Doc. 177 at 33.) Defendant testified that he was not fingerprinted
     until after the interrogation, but also stated that agents had not discover he was an overstay
28   until he was fingerprinted. *Id.* at 77-78, 84-85. Agent Marrufo claimed to talk to Defendant
     about his status before the interrogation, and Defendant's status was referenced during the
     interrogation. (Doc. 164 at 126, Exh. 9 at 13.)

1    education, fluent in English, and has been in the United States for well over a decade. (Doc.

2    177 at 53-54.) Before the interrogation, he slept in the cell and was not denied food or

3    drink, as far as the Court is aware. (Doc. 177 at 86-87.) After looking at the totality of the

4    circumstances, the general promises that telling the truth would be better and that the agents

5    would take the information to their superiors were insufficient to overbear Defendant's free

6    will. *See United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988) (promises

7    that agent would inform prosecutor of cooperation did not render statements involuntary).

8         This Court recommends denying Defendant's motion to suppress involuntary

9    statements.

10   ***Sixth Amendment***

11        The right to counsel is rooted in both the Fifth and Sixth Amendments of the United

12   States Constitution. *See McNeil*, 501 U.S. at 175 (considering Sixth Amendment right to

13   counsel); *Moran*, 475 U.S. at 420 (explaining *Miranda* required law enforcement to inform

14   suspects that, among other rights, they had right to counsel under Fifth Amendment). Here,

15   there has been no indication or argument that any of the statements were taken after an

16   adversarial judicial proceeding had commenced; thus, the Sixth Amendment had not

17   attached and does not provide relief to Defendant. *See McNeil*, 501 U.S. at 175 (quoting

18   *United States v. Gouveia*, 467 U.S. 180, 188 (1984)). Accordingly, this Court recommends

19   denying any relief under the Sixth Amendment.

20                    **Prosecutorial Vindictiveness/Misconduct**

21        Defendant argues that the Government acted vindictively by seeking a superseding

22   indictment after Defendant had rejected a plea offer and had exercised his right to confront

23   the material witnesses. (Doc. 94 at 5.) He maintains that the Government presented false

24   or deceptive testimony to the grand jury and misled Defendant as to importance of

25   Fernando Lucrecio-Morales. *Id.* at 5-6. He asks that the entire indictment be dismissed and

26   that the Government's offer to dismiss only Count Nine and strike Lucrecio-Morales be

27   denied.[8] (Doc. 94 at 1; Doc. 177 at 178.)

28   ───────────────
     [8]The record does not reflect that the Government has moved to strike Lucrecio-Morales
     from the indictment or dismiss any of the counts. To the extent the Government has

Due process prohibits prosecutors from penalizing a defendant for exerting their constitutional or statutory rights. *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978). When there exists a reasonable likelihood of vindictiveness, courts will presume the prosecutor was vindictive in increasing the number or severity of charges. *See United States v. Goodwin*, 457 U.S. 368, 373 (1982). Generally, this presumption does not arise pretrial because "the prosecutor may uncover additional information that suggests a basis for further prosecution, or he simply may come to realize that information possessed by the [government] has a broader significance." *Id.* at 381 ("At this stage of the proceedings, the prosecutor's assessment of the proper extent of prosecution may not have crystallized."); *United States v. Brown*, 875 F.3d 1235, 1240 (9th Cir. 2017). Absent a presumption, Defendant can succeed by showing actual vindictiveness. *Wasman v. United States*, 468 U.S. 599, 569 (1984); *Nunes v. Ramirez-Palmer*, 485 F.3d 432, 442 (9th Cir. 2007).

Here, the Government offered Defendant a pre-indictment plea, informing him it would be withdrawn if he did not accept by the upcoming status conference. (Doc. 94-1.) Defendant did not accept, and as promised, the Government withdrew the offer. This was not vindictive. *See Bordenkircher*, 434 U.S. at 363 (permitting "give-and-take" of plea negotiations if defendant is free to accept or reject). The grand jury returned a three-count indictment. (Doc. 35.) Following video deposition for three material witnesses, the parties agreed that Fernando Lucrecio-Morales could be released without completing his deposition. (Doc. 49.) Defendant claims that the prosecutors did not discover any new evidence between the original and superseding indictment. (Doc. 94 at 3.) The Government contends that it reexamined the facts of this case after the video deposition and decided to pursue more charges via the *Pinkerton* theory of liability. (Doc. 121-2 at 2-3.) This is the exact reason there is no presumption of vindictiveness pretrial, so prosecutors may reconsider evidence before their assessment has crystallized. *See Goodwin*, 457 U.S. at 381. It is possible that the Government was impressed with the video depositions or that a different prosecutor evaluated the evidence differently. There was no misconduct,

_____

attempted to do so, Defendant has objected. (Doc. 177 at 178.) Accordingly, the Court will make no recommendation or ruling on the Government's offer.

- 18 -

1   presumed or actual, in seeking a superseding incitement in this matter.

2       Defendant asserts that the AUSA articulated that Lucrecio-Morales "would no

3   longer be an issue." (Doc. 94 at 6.) This is not what the AUSA said; he expressed that he

4   "would just not be calling him as a witness, [and at trial the deposition was] not necessary

5   to move forward with the government's case." (Doc. 126 at 4:13-14.) However, given the

6   misunderstand by Defendant, the Government has proposed striking Lucrecio-Morales

7   from the indictment; the Court understands this offer to be gratuitous, especially as it does

8   not find any prosecutorial misconduct here. The Government is not obligated to call every

9   witness or person who may have information. *Cf. United States v. Bond*, 552 F.3d 1092,

10  1097 (9th Cir. 2009) (prosecution not obligated to call every witness on witness list).

11  Accordingly, the AUSA was not dishonest and will have to make the case without

12  Lucrecio-Morales.

13      The Government presented the case to the grand jury for a superseding indictment

14  in March 2020, more than a month after the depositions. (Exh. 11.) Defendant alleges that

15  the AUSA presented false testimony to the grand jury. (Doc. 94 at 6.) The AUSA asked

16  the following questions that are relevant to our inquiry: "[D]id a border patrol agent believe

17  he saw four people run from the house to the car, crouching as if to hide from view?"; "Did

18  it appear that [Defendant] sensed he was being followed and he drove back toward the

19  house?"; "Did he pull over, and did border patrol agents see two individuals run back to

20  the house?"; "According to [Defendant], did he pull up to the house four people ran out,

21  he told one to go back in, three got in and he drove them away?"; "Did he claim to have

22  dropped them off after he felt he was being followed?" (Exh. 11 at 2-5.) The case agent

23  answered in the affirmative to each of those questions. *Id.* These questions are not false

24  and when taken together are not misleading; instead, they present a full picture of each

25  side's contentions. The AUSA did not discuss the material witnesses' statements or

26  deposition except to say that three material witnesses identified Ramos as the man driving

27  the car. *Id.* at 7. It is not required to present all potential evidence to the grand jury. *Cf.*

28  *United States v. Navarro*, 608 F.3d 529, 537 (9th Cir. 2010) (explaining that prosecutors

do not have a duty to present exculpatory evidence to grand jury).

The grand jury returned a nine-count superseding indictment against Defendant. (Doc. 70.) Defendant argues that there is no evidence to support some of these charges. (Doc. 94 at 5.) These new charges are supported by the *Pinkerton* theory of liability, which "renders all co-conspirators criminally liable for reasonably foreseeable overt acts committed by others in furtherance of the conspiracy they have joined, whether they were aware of them or not." *See United States v. Hernandez-Orellana*, 539 F.3d 994, 1007 (9th Cir. 2008). For example, to transport undocumented immigrants, it may be foreseeable that members of the conspiracy will harbor those undocumented immigrants in furtherance of the transportation conspiracy.

This Court recommends denying Defendant's motion to dismiss. There has been no showing of prosecutorial misconduct or vindictiveness.

## RECOMMENDATION

Accordingly, it is recommended that, after its independent review of the record, the District Court deny Defendant's motions (Docs. 88, 89, 94). Pursuant to Federal Rule of Criminal Procedure 59(b)(2), any party may serve and file written objections within fourteen days of being served with a copy of this Report and Recommendation. A party may respond to the other party's objections within fourteen days. No reply brief shall be filed on objections unless leave is granted by the District Court. If objections are not timely filed, they may be deemed waived.

Dated this 5th day of February, 2021.

Honorable D. Thomas Ferraro
United States Magistrate Judge